_____
                                          )
                                          )
MICHAEL MURPHY,                           )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )
                                          )
                                          )       **Civil Action No. 15-12964**
CITY OF NEWTON et al.,                    )
                                          )
            Defendants.                   )
                                          )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                          **December 11, 2017**

## I.    Introduction

Plaintiff Michael Murphy ("Murphy") has filed this lawsuit against Defendants City of Newton (the "City") and Bruce Proia ("Proia"), chief of the Newton Fire Department, (collectively, "Defendants") alleging Fourth and Fourteenth Amendment violations brought pursuant to 42 U.S.C. § 1983 (Count I), violation of the Massachusetts Civil Rights Act (Count III), a Monell claim under 42 U.S.C. § 1983 (Count IV), violation of Article 14 of the Massachusetts Declaration of Rights (Count V), violation of the Massachusetts Privacy Act (Count VII) and intentional infliction of emotional distress (Count VIII). D. 16. Defendants have moved for summary judgment on all counts, D. 56, and Murphy has moved for summary judgment on all claims other than Counts VII and VIII, D. 62. For the reasons stated below, the Court ALLOWS Defendants' motion and DENIES Murphy's motion.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material

fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)) (internal quotation mark omitted). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (alteration in original) (quoting Anderson, 477 U.S. at 249). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

The following facts are taken from the parties' Rule 56.1 statements and accompanying documents and are otherwise undisputed unless noted. Murphy has been employed by the City of Newton Fire Department (the "Department") for nineteen years and currently serves as a lieutenant. D. 58 ¶¶ 1, 2; D. 73 ¶¶ 1, 2. The Department is headed by Fire Chief Proia, who has served in his current role since 2011. D. 65 ¶ 3. Proia is responsible for both the promulgation and modification of departmental policies as well as for the issuance of general personnel orders, so long as they are approved by the City's mayor. Id. ¶ 7; D. 65-3 at 6-7. From March 2009 until

August 2015, Murphy was assigned to Station 1, which was under the command of Carmine D'Agostino ("D'Agostino"). D. 58 ¶ 5; D. 73 ¶ 5. While both men initially worked well with one another, "friction" developed. D. 65 ¶ 18. During his time with the Department, Murphy has been subject to numerous disciplinary actions. D. 58 ¶ 3; D. 73 ¶ 3. Notably, Murphy was put under a return to work agreement in 2005 after the Department discovered that he suffered from a substance abuse problem. D. 58 ¶ 3; D. 73 ¶ 3. He was also cited for leaving the fire station without permission in 2007. D. 58 ¶ 3; D. 73 ¶ 3.

On May 9, 2015, Murphy was on duty at Station 1 for a twenty-four hour shift. D. 58 ¶ 6; D. 65 ¶ 20; D. 73 ¶ 6. D'Agostino was also on assignment that day. D. 65 ¶ 20. In the early afternoon, Murphy informed a junior firefighter, Cliff Arpino ("Arpino"), that he would be briefly stepping out of the fire station. D. 58 ¶ 7; D. 65 ¶ 21; D. 73 ¶ 7. While Arpino was under the impression that Murphy had permission to leave the station, Murphy had not informed D'Agostino that he would be doing so. D. 58 ¶¶ 8, 9; D. 73 ¶¶ 8, 9. Soon thereafter, a fire alarm came into the station, which Murphy became aware of either by radio or by the station's building speaker, and Murphy returned to the building to respond to the call. D. 58 ¶ 11; D. 65 ¶ 21; D. 73 ¶ 11. D'Agostino noticed that Murphy was not in the station at the time the fire alarm sounded and saw Murphy entering the station soon after the alarm went off. D. 58 ¶ 13; D. 73 ¶ 13. Following the call (which turned out to be a false alarm), D'Agostino approached Arpino to find out what Murphy was doing prior to the alarm. D. 65 ¶¶ 22, 23. Arpino informed him that Murphy had planned on leaving the station to purchase a coffee and that Arpino assumed Murphy had sought permission to do so beforehand. Id. ¶ 23. After learning that Murphy had left the station without authorization, D'Agostino called Deputy Chief Michael McNamara ("McNamara"), D'Agostino's supervisor and the shift commander at that time, to share his intention to reprimand Murphy. D. 58 ¶ 15.

Following this conversation, of which Murphy somehow became aware, D'Agostino witnessed Murphy again leaving the fire station. D. 65 ¶ 25. McNamara called Murphy to discuss the situation. Id. ¶ 26. During the course of this phone call, McNamara described Murphy as being agitated. D. 58 ¶ 17; D. 65 ¶ 26; D. 73 ¶ 17. Additionally, Murphy relayed to McNamara that he was leaving the station because he was "going to fucking kill someone." D. 58 ¶ 17; D. 65 ¶ 26; D. 73 ¶ 17. McNamara instead suggested that Murphy complete the remainder of his shift in a different fire station, which Murphy did without incident. D. 58 ¶ 18; D. 65 ¶ 27; D. 73 ¶ 18. McNamara then advised D'Agostino of what had transpired with Murphy, including the fact that Murphy had threatened to kill someone. D. 58 ¶ 19; D. 65 ¶ 30; D. 73 ¶ 19. On May 12, 2015, D'Agostino sent an e-mail to Proia, McNamara and Chief of Operations Gino Lucchetti ("Lucchetti") expressing concern with Murphy's comment that he would "fucking kill someone." D. 58 ¶ 21; D. 65 ¶ 37; D. 73 ¶ 21. D'Agostino noted that Murphy was scheduled to work the following day and that he had anxiety over "the safety of the men on duty in the city tomorrow" in light of Murphy's statement. D. 63-7 at 2; D. 65-12 at 2. In response, the City of Newton's Human Resources Department organized a meeting the next day to discuss the events that had occurred. D. 58 ¶ 22; D. 73 ¶ 22.

On May 13, 2015, Murphy, Proia, Human Resources Employment Manager Teri Struth ("Struth"), Newton fire fighter and union President Tom Lopez ("Lopez") and Interim Director of Health and Human Services Linda Walsh ("Walsh") convened to discuss the threat attributed to Murphy and the relationship between Murphy and D'Agostino. D. 58 ¶ 23; D. 65 ¶ 49[1]; D. 73 ¶ 23. When asked whether he made the threat, Murphy stated, "I don't believe I did. I might have.

---

[1] While Defendants dispute paragraph 49 to the extent it includes allegedly material facts based upon Murphy's personal feelings at the time of the meeting, they do not dispute the topics of the conversation at the meeting.

I don't think so." D. 58 ¶ 24; D. 73 ¶ 24. Proia found Murphy's conduct during the meeting to be "cocky, confident, evasive, untruthful and bizarre" in his interactions with those present. D. 65 ¶ 52. Similarly, Walsh found that Murphy was not acting "normally" during the meeting. Id. ¶ 53. Struth indicated to Proia that she thought Murphy was behaving "really, really bizarrely" and "really not typical," which Proia acknowledged. Id.; D. 65-5 at 25. At the meeting, Struth informed Murphy that to return to work, he would be required to complete a fitness for duty examination with the City's Employee Assistance Psychologist, Dr. Bruce Cedar ("Dr. Cedar"). D. 58 ¶ 25; D. 73 ¶ 25. Dr. Cedar had helped Murphy with his substance abuse problems in the past and Murphy indicated at the meeting that he was not opposed to meeting with the doctor. D. 58 ¶ 26; D. 73 ¶ 26.

Following the meeting, Murphy contacted Dr. Cedar and then went to Dr. Cedar's office to schedule an appointment. D. 65 ¶ 62. Dr. Cedar expressed in his later report that he was concerned that Murphy was trying to "play" him and had contacted him prior to a formal appointment to put his "spin" on the events that had led to the order of the fitness for duty test in the first place. D. 58 ¶ 29; D. 63-8 at 4; D. 73 ¶ 29. He noted that his suspicion was bolstered by the fact that Murphy had contacted him before the City did so. D. 58 ¶ 27; D. 63-8 at 4; D. 73 ¶ 27.

Murphy met with Dr. Cedar for his appointment on May 15, 2015. D. 58 ¶ 30; D. 65 ¶ 63; D. 73 ¶ 30. During the appointment, Dr. Cedar asked Murphy to provide a urine sample for drug testing. D. 58 ¶ 31; D. 65 ¶ 64; D. 73 ¶ 31. Dr. Cedar's reason for asking Murphy to submit to a drug test were: (1) Murphy had been referred to him for a fitness of duty evaluation and he wanted to rule out all possible factors that might have influenced Murphy's behavior; (2) Murphy had a history of substance abuse issues and Dr. Cedar wanted to ensure he had not relapsed; and (3)

multiple individuals present at the May 13th meeting had observed Murphy's behavior to be erratic. D. 58 ¶ 32; D. 65 ¶ 64; D. 73 ¶ 32. Murphy refused to submit to drug testing, explaining that there was a provision of the collective bargaining agreement between the City and the firefighters' union that dealt with drug testing and Dr. Cedar's request did not comply with those terms. D. 58 ¶ 33; D. 65 ¶ 65; D. 73 ¶ 33. Struth explained to Murphy that he would not be allowed to return to work until he was cleared as fit by Dr. Cedar. D. 65 ¶ 73.[2]

On May 22, 2015, Murphy returned to Dr. Cedar's office and Dr. Cedar again requested that Murphy submit to a drug test. D. 58 ¶ 39; D. 73 ¶ 39. At this appointment, Murphy agreed to submit a urine sample. D. 58 ¶ 40; D. 73 ¶ 40. In his May 25, 2015 report, Dr. Cedar cleared Murphy as fit for duty. D. 63-8; D. 65-14. The report noted that the urine sample "would not be tested until the contract issues were worked out between the City and the Union." D. 63-8 at 4; D. 65-14 at 4. Dr. Cedar further explained that although he was clearing Murphy as fit, he "encourage[d] the City and the Union to come to terms on the testing of the sample," as he "would rather that [his] 'Yes, [Murphy] can return to work' was contingent on a negative drug test." D. 63-8 at 6; D. 65-15 at 6.

The sample was eventually tested, despite the objections levied by Lopez (Murphy's union representative). D. 58 ¶ 42; D. 65 ¶ 97; D. 73 ¶ 42. The test came back positive for marijuana and Proia placed Murphy on paid administrative leave and scheduled a disciplinary hearing. D. 58 ¶¶ 43, 44; D. 65 ¶ 105; D. 73 ¶¶ 43, 44. The disciplinary hearing took place on June 23, 2015, although the parties were not able fully to resolve the issues and a second hearing date was

---

[2] While Defendants dispute the facts outlined in paragraph 73 as not having sufficient supporting references, the portion of Struth's testimony that Murphy cites states in relevant part, "I told him that I needed him to get evaluated and he couldn't come back to work until I had a clear evaluation of clear fit-for-duty." D. 65-13 at 179. As such, the fact that Murphy was not allowed to return to work without being cleared by Dr. Cedar is not reasonably disputed.

scheduled for late July. D. 58 ¶¶ 48, 52; D. 73 ¶¶ 48, 52. On June 24, 2015, however, Proia issued three letters to Murphy that: (1) dropped the drug test charge against him and returned him to work effective immediately; (2) dropped the charge against him concerning the threatening statement that he made and returned him to work effective immediately; and (3) charged Murphy with a two-day suspension for leaving the station without permission. D. 58 ¶ 53; D. 65 ¶¶ 115, 120; D. 73 ¶ 53.

Also in June 2015, Murphy's union filed two grievances concerning the collection and testing of Murphy's urine sample. D. 65 ¶ 121. Struth denied these grievances on August 13, 2015 and the matter proceeded to binding arbitration on June 23, 2016. Id. ¶¶ 122, 123. The arbitrator found that the City violated the screening procedures in the collective bargaining agreement. D. 58 ¶ 55; D. 73 ¶ 55. The City has appealed the arbitrator's findings. Id.; D. 65-29.

## IV. Procedural History

Murphy instituted this action on July 17, 2015. D. 1. On April 27, 2017, Murphy voluntarily dismissed Counts II and VI of the amended complaint. D. 55. The Court heard the parties on the pending summary judgment motions and took these matters under advisement. D. 77.

## V. Discussion

### A. Counts I and V

#### 1. Count I

Count I of the amended complaint advances a § 1983 claim against Proia premised on the Fourth and Fourteenth Amendments. D. 16 at 21. Murphy and Proia both move for summary judgment on this claim. D. 56; D. 62. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law . . .

[and] second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). There is no dispute here that Proia acted under color of state law at all points relevant to the events underlying this litigation. As such, the Court's inquiry focuses on the Fourth Amendment concerns raised by Murphy, namely whether the testing of the urine sample collected by Dr. Cedar constitutes an unreasonable search and seizure.

"[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619 (1989). "[N]either a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989). Thus, "when special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable," it will be dispensed with. Skinner, 489 U.S. at 619 (quoting Griffin v. Wisconsin, 483 U.S. 868, 873 (1987)) (internal quotation marks omitted).

In National Treasury Employees Union v. Von Raab, the Supreme Court was tasked with deciding whether the collection and subsequent chemical analysis of urine samples associated with a drug-screening program of the United States Customs Service met the reasonableness requirement of the Fourth Amendment. See Von Raab, 489 U.S. at 672. The employees subject to the required drug testing sought promotion or transfer to positions that: (1) had a direct involvement in drug interdiction; (2) required the employee to carry firearms; or (3) allowed the employee to handle "classified" material. Id. at 660-61. Being selected for the position was contingent upon successful completion of the drug screening. Id. at 661. The Supreme Court determined that the Custom Service's testing requirement passed constitutional muster. Id. at 672.

Specifically, the court held that under the "special needs" exception, "it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." Von Raab, 489 U.S. at 665-66.

Similarly, in Skinner, the Supreme Court considered whether certain railroad regulations were valid under the Fourth Amendment. Skinner, 489 U.S. at 606. One regulation mandated that railroad employees involved in major train accidents or incidents submit to blood and urine tests to determine whether they were under the influence of substances at the time of the crash. Id. at 609. Another regulation allowed, but did not require, railroads to administer breath and/or urine tests to certain employees who violated certain safety rules. Id. at 611. The Supreme Court held that although there was no requirement of a warrant or reasonable suspicion that an employee might be impaired, the regulations authorizing the tests were nonetheless reasonable. Id. at 633. In doing so, the court explained that the compelling governmental interest in railroad safety outweighed the employee's privacy concerns and that such interests would be hindered if the railroads were required to articulate particular facts giving rise to a reasonable suspicion of impairment before testing an employee. Id. Both Skinner and Von Raab, then, stand for the proposition that safety concerns associated with certain types of employment may lower employees' reasonable expectations of privacy.

Like the plaintiffs in Van Raab and Skinner, firefighters are generally considered to be a class of employees who may be drug tested due to safety concerns. See Wilcher v. City of Wilmington, 139 F.3d 366, 374 (3d Cir. 1998) (noting that "[a] firefighter whose drug use is undetected is a source of danger both to his colleagues and to the community at large"); Saavedra v. City of Albuquerque, 73 F.3d 1525, 1532 (10th Cir. 1996) (upholding the drug testing of a

firefighter because firefighting is a safety sensitive position). That is, substance abuse by a firefighter has the capacity to impair judgment and put the lives of fellow firefighters and the public-at-large in potential danger.

Here, Murphy was accused of making a statement in which he threatened to "fucking kill someone" in response to an otherwise minor disciplinary write-up by his supervisor. D. 58 ¶ 17; D. 65 ¶ 26; D. 73 ¶ 17. At the meeting assembled to address Murphy's threat, numerous attendees noted that Murphy was not acting "normally" and behaved in a "bizarre" manner. D. 65 ¶¶ 52-53; D. 65-5 at 25-27. Moreover, Murphy had a prior history of substance abuse and the physician tasked with evaluating him for a fitness of duty examination was concerned that Murphy may have relapsed. D. 58 ¶¶ 3, 32; D. 65 ¶ 64; D. 73 ¶¶ 3, 32. These undisputed facts must be balanced along with the City's interest in maintaining a fire fighting force capable of responding to significant emergency situations. As the Supreme Court has noted, safety-sensitive employees— like firefighters who risk their lives in service to the public—"discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Skinner, 489 U.S. at 628. The record presented here compels the Court to conclude that the testing of Murphy's urine sample for the presence of drugs was not unreasonable within the meaning of the Fourth Amendment.

Murphy counters that the legality of his drug testing has already been adjudicated through binding arbitration. D. 66 at 4. He contends that this Court would necessarily run afoul of preclusion principles if it were to conclude that the urinalysis procedures were constitutionally sound. Id. at 4-9. Under the full faith and credit statute, 28 U.S.C. § 1738, a judgment rendered in a state court is entitled to the same preclusive effect in federal court as it would be given within the state in which it was rendered. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81

(1984).  Here, the judgment Murphy relies upon occurred in an arbitration proceeding.  Res judicata, however, "applies with equal force to arbitration . . . subject to the same exceptions and qualifications, as a judgment of a court."  <u>Hopkinton Drug, Inc. v. CaremarkPCS, LLC</u>, 77 F. Supp. 3d 237, 254 (D. Mass. 2015)  (citation and internal quotation marks omitted).  While final arbitral awards are generally afforded the same preclusive effects as are prior court judgments, "there may be particular difficulties" in applying preclusion principles to an arbitral award, especially where the reasoning behind the award is unexplained.  <u>FleetBoston Fin. Corp. v. Alt</u>, 638 F.3d 70, 80 (1st Cir. 2011).  Thus, "it has been suggested that courts have discretion as to whether issue preclusion is appropriate" in the arbitration context.  <u>Id.</u> (citing 18B Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 4475.1, at 518 (2d ed. 2002)).

To address Murphy's arguments, a brief synopsis of the arbitration is warranted.  The arbitration proceeding focused upon whether the City violated the drug screening process outlined in the collective bargaining agreement ("CBA") between the City and the firefighter's union.  D. 65-27 at 5.  Under Section 35.01 of the CBA, "[t]he Fire Chief, or his designee in the Chief's absence, for reasonable cause may require that a firefighter submit a test sample forthwith for drug screening to be administered by [a healthcare professional]."  D. 63-9 at 31.  The CBA stipulates that a drug test conducted pursuant to Section 35.01 is subject to a review procedure laid out in Section 35.02.  <u>Id.</u>  Under that section, a firefighter may initiate a review of the Fire Chief's directive, which is then reviewed by a three-person committee to determine whether the Fire Chief has sufficient information to establish reasonable cause to request a screening.  <u>Id.</u>  After a hearing, the arbitrator determined that the City violated the drug screening procedures contained in Article 35.  D. 65-27 at 22-23.

In so concluding, the arbitrator explained that Sections 35.01 and 35.02 of the CBA are "clear and unambiguous." D. 65-27 at 14. The parties intended that only "the Chief or his designee . . . can order a Firefighter to submit a drug test sample, but that no one else may do so." Id. at 14-15. The arbitrator determined, however, that "[i]t was Dr. Cedar, not the Chief or any other City agent who sent the grievant for a drug test collection." D. 65-27 at 14. Thus, Section 35.01 of the CBA was not followed. The arbitrator explained that "[t]he Chief's order to test the sample requested by Dr. Cedar does not convert Dr. Cedar's requested sample to an order by the Chief that the grievant produce a sample." Id. In other words, Proia and the City could not discipline Murphy for a positive drug test under Article 35 of the CBA when the drug test was not explicitly ordered by Proia as required under Section 35.01. Id. at 15 (noting that "the City cannot piggyback on Dr. Cedar's request for a drug test sample by the Chief's directive to test the sample that he did not order"). This is especially, true, the arbitrator noted, where Murphy was not provided an opportunity under Section 35.02 to challenge the testing of his urine sample in front of a three person panel. D. 65-27 at 11, 21.

In light of these facts, it is unclear what preclusive effect the arbitrator's determinations would have on the instant litigation. Murphy seems to suggest that the reasonableness standard outlined in Article 35 of the CBA and the Fourth Amendment's reasonableness standard are substantively identical. D. 66 at 13. He argues that because the arbitrator found that the City had violated the CBA in testing Murphy's urine sample, the Court must also find a Fourth Amendment violation as a result. This argument is unavailing.

First, Murphy's assertion of claim preclusion fails as a matter of law. "Res judicata, in its claim preclusion aspect, is intended to prevent the re-litigation of claims already litigated or that should have been litigated in an earlier action." Iantosca v. Step Plan Servs., Inc., 604 F.3d 24, 30

(1st Cir. 2010) (citation omitted).  As a substantive matter, claim preclusion can be invoked where (1) the identity of the parties in each proceeding is identical or there is privity between them, (2) the cause of action is sufficiently the same, and (3) there was a prior final judgment on the merits. Kobrin v. Bd. of Regis. in Med., 444 Mass. 837, 843 (2005).  Here, however, the parties to the arbitration and the current litigation are not the same and are not in sufficient privity with one another.  While the parties to the arbitration were the City and the firefighters' union, the parties here are Murphy, the City and Proia.  Under the substantial control doctrine, privity may be found where parties in the current action exhibited substantial control over the parties in the previous arbitration.  Bourque v. Cape Southport Assocs., LLC, 60 Mass. App. Ct. 271, 275 (2004).  Here, however, there is no evidence on the record that Murphy exhibited "substantial control" over the union in the prior action, nor can the same be said for Proia vis-à-vis the City.  Furthermore, "[t]he fact that the [parties may have] shared an interest in proving or disproving some of the same facts [in the arbitration] does not establish that privity existed between them."  Id.  Additionally, the causes of action here are not sufficiently related to the claim presented at arbitration.  While the arbitrator was tasked with determining whether the City breached the CBA, no such breach of contract claim exists here.  Significantly, the arbitrator would have lacked authority to determine any claims similar to those present in this case.  See Alexander v. Gardner-Denver Co., 415 U.S. 36, 53, 57-58 (explaining that "[t]he arbitrator . . . has no general authority to invoke public laws that conflict with the bargain between the parties . . . If an arbitral decision is based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective-bargaining agreement, the arbitrator has 'exceeded the scope of the submission'").  As such, claim preclusion does not apply.

Nor does issue preclusion apply. "[I]n its issue preclusion aspect, [res judicata] prevents (with qualifications) re-litigation of issues earlier decided even if the subsequent case involves a different claim." Iantosca, 604 F.3d at 30. The doctrine applies to issues of fact as well as those of law, Allen v. McCurry, 449 U.S. 90, 94 (1980), and "can apply where the subsequent proceeding involves a cause of action different from the first," Manganella v. Evanston Ins. Co., 700 F.3d 585, 591 (1st Cir. 2012). Here, however, the arbitrator's determination that the City violated the CBA sheds no light on whether the testing of Murphy's urine sample was unreasonable under Fourth Amendment analysis. Furthermore, the Court's conclusion that privity does not exist between the parties disposes of Murphy's issue preclusion argument. See Bourque, 60 Mass. App. Ct. at 275, 277 (concluding that "[w]ithout privity between the party to the prior action and the party to the present action against whom issue preclusion is being sought, issue preclusion is not possible").

Finally, even if the Court were to embrace the conclusions reached by the arbitrator, they would not change the outcome of the Court's analysis here. The requirements for drug testing under the CBA does not parallel the reasonableness standard outlined by the Supreme Court under the Fourth Amendment.

In light of the above analysis, the Court GRANTS summary judgment in favor of Defendants as to Murphy's 1983 claims.[3]

       2.    *Count V*

---

[3] To the extent that Count I contains a claim that Murphy's substantive due process rights were violated under a Fourteenth Amendment theory, the record does not support such a claim for the same reasons Murphy's intentional infliction of emotional distress claim fails. See *infra* at 23-24. To prevail on such a claim, Murphy "must show . . . that the acts were so egregious as to shock the conscience" and "that they deprived him of a protected interest in life, liberty, or property." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006). No such "extreme and egregious, or, put another way, truly outrageous, uncivilized, and intolerable" actions can be demonstrated from the record before the Court. Id. (citations and internal quotation marks omitted).

Murphy also brings a claim pursuant to Article 14 of the Massachusetts Declaration of Rights that his subjection to substance abuse testing violated state constitutional law. Like his claim brought under the Fourth Amendment, Murphy must demonstrate that the drug test was an unreasonable search and seizure. See Jackson v. Liquid Carbonic Corp., 863 F.2d 111, 113, 115 (1st Cir. 1988). While it is true that Article 14 closely mirrors the Fourth Amendment, see id. at 15, the protections covered by each are not identical. See Guiney v. Police Comm'r of Boston, 411 Mass. 328, 332-33 (1991) (quoting Von Raab, 489 U.S. at 675 n.3) (citation and internal quotation marks omitted).

Murphy argues that Guiney demonstrates the Supreme Judicial Court's clear rejection of the "special needs" exception formulated in the context of the Fourth Amendment. D. 72 at 12. That conclusion does not follow. Indeed, the SJC has stated that it "express[es] no opinion" as to the result it would reach if confronted with a case in which the state interest concerned public safety considerations similar to those present in Van Raab and other railway safety scenarios. See Horsemen's Benevolent & Protective Ass'n v. State Racing Comm'n, 403 Mass. 692, 703 n.3 (1989) (concluding that random urinalysis testing cannot survive constitutional considerations where the purpose of random drug testing program is to prevent improperly won or lost horse races and not inexorable catastrophes); see also Johnson v. Mass. Bay Transp. Auth., 418 Mass. 783, 786 n.1 (1994) (noting that "[b]ecause there was probable cause [to test an MBTA bus driver], we need not decide whether in some situations the responsibilities of an employee are so important to the public safety that, in the absence of consent, a public employer may nevertheless require testing for drugs on the basis of something less than probable cause"). Moreover, the drug testing in Guiney was random, not particularized as is the case here. Thus, while the Court rejects Murphy's argument that the "special needs" exception outlined in Van Raab is inapplicable under state law,

it nevertheless evaluates whether probable cause existed for Murphy's drug test for the sake of thoroughness.

For probable cause to be met, "there must be facts and circumstances sufficient to warrant a prudent person's belief that [an individual subjected to urinalysis] more probably than not has used illicit drugs." Horsemen's Benevolent & Protective Ass'n, 403 Mass. at 705-06. Such a belief must be based on "reliable, specific objective facts." Id. at 706. The Supreme Judicial Court has outlined particular factors that may influence the reasonableness of a search and seizure in this context: (1) the nature of the information, (2) the reliability of the informant, (3) the degree of corroboration, and (4) other facts contributing to the belief. Id. Here, Murphy's supervisors were aware that Murphy had been reprimanded for leaving the fire station numerous times without permission; they were aware of Murphy's threat; they witnessed him acting in a bizarre manner during their meeting with him on May 13, 2015; they knew of Murphy's previous struggle with substance abuse issues and the effect it had on his ability to perform at work years previously; they were in possession of Dr. Cedar's report that expressed concern about Murphy's potential for relapsing; and they were aware that although Dr. Cedar cleared Murphy fit to return to work, he expressed discomfort doing so without a negative drug test. Taken together, these facts support a finding of probable cause to conduct a urinalysis test on the sample Dr. Cedar collected. See Johnson v. Massachusetts Bay Transportation Authority, 418 Mass. at 784-86.

Murphy counters that while the holding in Johnson is correct, the primary difference here is that no probable cause existed to warrant Proia's order that Murphy's urine sample be tested for drugs. Murphy specifically points to Proia's deposition in which he states numerous times that at the May 13, 2015 meeting, he did not believe he had reasonable cause to order Murphy to be tested. D. 65-2 at 39-41. First, the determination of probable cause is objective, and focuses on "whether

the facts would warrant a 'reasonable' person in believing the action taken to be appropriate." Com. v. Daniel, 464 Mass. 746, 751 (2013) (quoting Commonwealth v. Hason, 387 Mass. 169, 175 (1982)). As such, Proia's subjective opinion is not dispositive. Second, Murphy's representation of Proia's statements at the deposition does not present the full picture of Proia's testimony. Proia was asked whether he "form[ed] the opinion during [the May 13, 2015] meeting that Murphy was impaired." D. 65-2 at 38. In answering in the negative, Proia stated, "I didn't on - - I'm not a doctor, I don't make those determinations." Id. at 38-39. That is, Proia did not believe at the time of the meeting that he possessed sufficient knowledge to make a judgment call as to whether the cause of Murphy's observed behavior was the result of inebriation. Even if Proia did not possess probable cause to order the testing of Murphy's urine for the presence of illegal substances initially, the situation changed materially with the addition of Dr. Cedar's evaluation, which expressed particular concerns about Murphy and outlined distinct reasons for why such a test was necessary. Indeed, Proia only ordered the drug test after Dr. Cedar had already collected the sample from Murphy—which Murphy voluntarily provided—and after Dr. Cedar had filed his report listing the individualized, specific reasons for the necessity of the test. D. 65 ¶¶ 64, 83, 101, 110 . Proia and his colleagues were armed with the knowledge of Murphy's threatening statement, past substance abuse problems and bizarre behavior at the human resources meeting. Coupled with the written report of a professional physician, a reasonable person could believe that Murphy's behavior resulted from the presence of substances. Probable cause, therefore, existed. Summary judgment as to Count V is GRANTED in favor of Defendants.

**B.** **Count III**

Both parties have also moved for summary judgment as to Murphy's allegation that Proia violated his constitutional rights under Mass. Gen. L. c. 12, §§ H-I, the Massachusetts Civil Rights

Act ("MCRA"). D. 57 at 14; D. 66 at 14. "Not every violation of law is a violation of the [Massachusetts Civil Rights Act]." Brunelle v. Lynn Pub. Sch., 433 Mass. 179, 182 (2001) (quoting Longval v. Comm'r of Corr., 404 Mass. 325, 333 (1989)) (internal quotation marks omitted). To establish a claim under the act, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." Currier v. Nat'l Bd. of Med. Exam'rs, 462 Mass. 1, 12, (2012). A "threat" is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." Haufler v. Zotos, 446 Mass. 489, 505 (2006) (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994)) (internal quotation marks omitted). "Intimidation" is "putting [one] in fear for the purpose of compelling or deterring conduct." Id. (quoting Planned Parenthood League of Mass., Inc., 417 Mass. at 474) (internal quotation marks omitted). "Coercion is the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Id. (quoting Buster v. George W. Moore, Inc., 438 Mass. 635, 646 (2003)) (internal quotation marks omitted). The legislature intended that "even a direct deprivation of a plaintiff's secured rights would not be actionable under the act unless it were accomplished by means of one of these three constraining elements." Buster, 438 Mass. at 646.

For the reasons discussed above, Murphy has failed to make out a prima facie case demonstrating a violation of either the Fourth Amendment or Article 14 of the Massachusetts Declaration of Rights. Beyond that, Murphy has not demonstrated that Proia used "threats, intimidation, or coercion" against him as required under MCRA. Murphy argues that Proia prevented him from returning to work without being cleared as fit by Dr. Cedar and because Dr. Cedar was unwilling to provide that designation absent submission to a drug test, Murphy was

necessarily coerced into providing a urine sample to return to work.  D. 66 at 14-17.  Murphy further states that his union representative, Lopez, explained that he had three choices in the situation:  (1) he could refuse to submit to the test and, therefore, would be treated by the City as having tested positive; (2) he could comply with Dr. Cedar's request and waive his rights under the CBA to challenge the taking of the sample; or (3) he could comply with Dr. Cedar's request while retaining his rights under the CBA to challenge the taking of the sample.  D. 65 at 26.  Regardless of the advice given by Murphy's union representative, the fact remains that Murphy consented to providing Dr. Cedar with his urine sample.  Indeed, in <u>Johnson</u>, the Supreme Judicial Court considered this exact question.  There, the court concluded that a court is "warranted in finding that [an employee] consented to [urinalysis] tests . . . [where] he agreed to the tests only because of the coercion that he would have been terminated if he did not consent," and so resolved that there was no viable Massachusetts Civil Rights Act claim.  <u>Johnson</u>, 418 Mass. at 786.  The same is not only true here, but is bolstered by Murphy's own testimony.  Murphy admitted that taking a drug test under the belief that a refusal would be considered a positive test is different from being coerced.  <u>See</u> D. 59-2 at 7 ("Q:  . . . I understand your feeling, geez, maybe if I don't take it, it will be considered a positive, but that's different than coercion, right?  A:  I suppose, yes").  He further was unable to identify who threatened, intimidated and coerced him, answering simply "the powers to be."  D. 59-2 at 8.  When asked who the "powers to be" were, Murphy stated, "[w]hoever can make me submit to a drug test."  <u>Id.</u>  Whether Murphy submitted to the drug test under the belief—mistaken or otherwise—that failure to do so would either (1) be considered a positive test does or (2) keep him out of work, does not meet the threshold required under Mass. Gen. L. c. 12, §§ H-I to give rise to a coercive action.

Murphy's claim fails for the additional reason that the City's ordinances provided Struth, as the director of human resources, and Proia, as Murphy's department head, the authority to mandate Murphy submit to a fitness for duty examination. See Newton, Mass., Rev. Ordinances § 2-46(c) (2012); D. 59-3; D. 65-6 (explaining that "[u]pon determination by a department head, the director of human resources or the mayor that an employee, while engaged in the performance of their duty, appears to be suffering from sickness or injury so as to constitute a hazard to their health or the health of other persons, the director of human resources may order such employee to discontinue their duties for such time as the director deems desirable and may require such employee to undergo an examination by a qualified health care provider(s)"). Neither Proia nor Struth ordered Murphy to undergo a drug test in their direct capacity, which would have triggered the procedural mechanisms outlined in the CBA. They were, however, well within their authority under Section 2-46(c) to require Murphy be cleared as fit for duty before returning back to work. That Dr. Cedar would only clear Murphy subject to his providing a urine sample does not alter the fact that Proia and Struth possessed the authority to prevent Murphy from returning to work without proper physician clearance. Coercion, then, cannot be found here, where Proia and Struth did no more than assert the regulatory power granted to them under the City's ordinances. For all of these reasons, the Court GRANTS Defendants' motion for summary judgment as to Murphy's claim brought under the Massachusetts Civil Rights Act.

### C. Count IV

Count IV of the amended complaint asserts a § 1983 Monell liability claim against the City. In Monell v. Department of Social Services of New York, 436 U.S. 658 (1978), the Supreme Court held that a municipality could be liable in certain cases when its agents and employees committed constitutional violations. To succeed on a Monell liability claim, the plaintiff is required to

demonstrate "both the existence of a policy or custom and a 'direct causal link' between that policy and the alleged constitutional deprivation." Williams v. Bisceglia, 115 F. Supp. 3d 184, 188 (D. Mass. 2015) (quoting City of Canton v. Harris, 489 U.S. 378, 387 (1989)). In addition, "the municipality [must] possess[] the requisite level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference.'" Young, 404 F.3d at 26.

Here, Murphy argues that the City should be liable under Monell based upon policies implemented by Proia as a final policymaker for the City. D. 66 at 18.[4] Murphy, however, has not identified a specific policy or custom responsible for the deprivation of his constitutional rights and that omission is fatal to his claim. While Murphy alleges that Proia violated his Fourth and Fourteenth Amendment rights by ordering the testing of the urine sample, those actions fail to provide the requisite foundation to make an inferential leap that a constitutionally flawed policy or custom within the Department or the City exists. True, the Supreme Court has "assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business," Broderick v. Roache, 803 F. Supp. 480, 484 (D. Mass. 1992) (citations omitted), but Murphy has not provided the Court with any facts that demonstrate a more generalized practice endorsed by the City that would cause the City to be held liable. Indeed, the standard requires Murphy to point to "practices so persistent and widespread as to practically have the force of law," Connick v. Thompson, 563 U.S. 51, 61 (2011), and Murphy has pointed to no such policy. The Court, therefore, GRANTS summary judgment in favor of Defendants as to Count IV.

---

[4] The Court notes that while Murphy also alleges that the City should be liable based upon the actions of Struth, there is no argument concerning how Struth violated Murphy's constitutional rights or how policies promulgated by her would expose the City to liability under Monell. To the extent Murphy maintains Struth deprived him of his Fourth Amendment rights, the Court has already determined that the urinalysis was a reasonable search.

### D.    Count VII

Murphy has also alleged that the drug testing violated his statutory right to privacy under Mass. Gen. L. c. 214, § 1B.  Under that statute, "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."  The statute "proscribe[s] the required disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest." Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508, 518 (1984).  To determine whether the inquiry amounts to a violation of c. 214, § 1B, "the employer's legitimate interest in determining the employees' effectiveness in their jobs should be balanced against the seriousness of the intrusion on the employees' privacy." O'Connor v. Police Comm'r of Bos., 408 Mass. 324, 330 (1990) (quoting Bratt, 392 Mass. at 520).  The Court, however, has already determined that the testing of Murphy did not violate either the Fourth Amendment or Article 14 of the Massachusetts Declaration of Rights.  That determination "substantially resolves [Murphy's] claim under G.L. c. 214, § 1B as well." O'Connor, 408 Mass. at 329.  Thus, while it is true that "requiring an employee to submit to urinalysis involves a significant invasion of privacy," Folmsbee v. Tech Tool Grinding & Supply, Inc., 417 Mass. 388, 392 (1994), "an employer may have a substantial and valid interest in aspects of an employee's health that could affect the employee's ability effectively to perform job duties," Bratt, 392 Mass. at 524.  Here, Defendants had sufficient cause to question Murphy's sobriety—especially in light of his former substance abuse issues and his physician's concern that relapse was a possibility in light of his odd behavior at work.  Any interference the drug testing imposed on Murphy's privacy was not "unreasonable, substantial or serious" within the meaning of the statutory words. See Webster v. Motorola, Inc., 418 Mass. 425, 433 (1994) (holding a corporation's legitimate business interest in ensuring that an employee not operate a motor vehicle while intoxicated by drugs outweighs the

employee's privacy interests under the Privacy Act); <u>Folmsbee</u>, 417 Mass. at 394 (concluding that employer did not violate c. 214, § 1B by requiring tool grinder to submit to drug testing in the absence of any particularized suspicion that she had ingested illegal drugs where her work required her to be alert and careful); <u>O'Connor</u>, 408 Mass. at 330-331 (determining that a mandatory drug testing of a police cadet consistent with Article 14 did not violate cadet's statutory right to privacy). Consequently, Defendants' motion for summary judgment as to Count VII is GRANTED.

## E.    <u>Count VIII</u>

To establish a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that:  (1) the defendant's intentional or reckless conduct; (2) was so extreme and outrageous; (3) that it caused the plaintiff severe emotional distress beyond that which a reasonable person would be expected to endure.  Restatement (Second) Torts § 46(1); <u>see</u> <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 144–45 (1976).  To be considered "extreme and outrageous," the defendant's conduct must go beyond all possible bounds of decency and be utterly intolerable in a civilized community.  <u>Sena v. Commonwealth</u>, 417 Mass. 250, 264 (1994) (quoting <u>Agis</u>, 371 Mass. at 145).  Insults, ill manners, rough language, inconsiderate and unkind acts and even threats do not give rise to liability for intentional infliction of emotional distress. <u>See</u> <u>Cady v. Marcella</u>, 49 Mass. App. Ct. 334, 340-41 (2000) (citing <u>Sena</u>, 417 Mass. at 263-64).

Here, the Defendants argue Murphy has failed to present a viable claim for intentional infliction of emotional distress because none of the conduct alleged, even if true, could be considered extreme and outrageous.  D. 57 at 18-20.  The Court agrees.  Neither the sequence nor the nature of events recited above rise to the level of extreme and outrageous conduct. These facts are not demonstrative of the type of "reckless[ness], ruthlessness or deliberate malevolence" required to state a claim.  <u>Conway v. Smerling</u>, 37 Mass. App. Ct. 1, 8 (1994).

Moreover, Murphy has not offered sufficient evidence from which to infer that he "suffered distress so severe that no reasonable person could be expected to endure it." <u>Lane v. Mem'l Press, Inc.</u>, No. CIV. A. 96-1281C, 2000 WL 559547, at *5 (Mass. Super. Apr. 10, 2000). He is not seeking medical care for any emotional distress and has stated only that his primary care physician is "aware" of the events described in his complaint. D. 59-2 at 10-11. Additionally, while Murphy takes medication for stress, his dosage has not increased as a result of the events alleged here. <u>Id.</u> at 4-5. The Court, therefore, concludes that as a matter of law Defendants' motion for summary judgment as to Claim VIII must be GRANTED.

## VI. Conclusion

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment, D. 57, and DENIES Murphy's motion for summary judgment, D. 66.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge
